In re Charles R. RANSFORD, Jr. and
Debra D. Ransford, Debtors.

Charles P. NORCROSS and Phyllis
M. Norcross, Plaintiffs,

v.

Charles R. RANSFORD, Jr. and Debra
D. Ransford, Defendants.

Bankruptcy No. 94–44006–HJB.
Adversary No. 95–4022.

United States Bankruptcy Court,
D. Massachusetts.

Nov. 1, 1996.

James J. Sisto, Pittsfield, MA, and Richard
G. Birchall, Suffield, CT, for Debtors.

Richard M. Howland, Amherst, MA, for
Plaintiffs.

Jack E. Houghton, Chapter 7 Trustee.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is a Complaint filed by Charles and Phyllis Norcross (individually "Mr." or "Ms. Norcross" or jointly the "Plaintiffs") in which they seek a determination that the debt owed them by Charles Ransford, Jr. ("Ransford, Jr.") and his wife Debra Ransford (jointly the "Debtors" or the "Defendants") be declared nondischargeable, pursuant to 11 U.S.C. § 523(a)(2). Trial in this case was originally scheduled for April 4, 1996. After the opening statements of counsel, it appeared that, even assuming the truth of the allegations made by the Plaintiffs, the Plaintiffs might not be able to prevail as a matter of law. The Court then suspended the trial and took the matter under advisement, affording both parties an opportunity to file briefs. Therefore, the Court takes the matter as if the Debtors had filed a motion for summary judgment, with the Court resolving any disputed facts and inferences in favor of the Plaintiffs. *Fleet Nat'l Bank v. H & D Entertainment, Inc.*, 96 F.3d 532, 537 (1st Cir. 1996); *Aero–Fastener, Inc. v. Sierracin Corp. (In re Aero–Fastener)*, 177 B.R. 120, 135 (Bankr.D.Mass.1994).

## I. *Facts*

The parties have been acquainted for many years. In fact, the Plaintiffs and the Debtors' parents, Charles Ransford, Sr. ("Ransford, Sr.") and his wife, were close friends and frequently socialized together. The Debtors themselves were also quite close to and in regular contact with the Plaintiffs.

On May 3, 1985, Ransford, Sr. executed a deed (the "First Deed") conveying record title to a very valuable parcel of real property in Williamstown, Massachusetts (the "Hopper Farm") to his son, Ransford, Jr. for no consideration.[1] Immediately thereafter, Ransford, Jr. executed a deed (the "Second Deed") conveying the property back to his father for the recited consideration of one dollar. The First Deed was recorded in the Commonwealth of Massachusetts Northern Berkshire Registry of Deeds on May 14,

1985. However, the Second Deed was not recorded with the said Registry of Deeds until August 6, 1992. Nevertheless, in various social gatherings after 1985, Ransford, Sr. and his wife told the Plaintiffs that Ransford, Jr. owned the Hopper Farm.

In 1991, the Plaintiffs decided to sell their swimming pool and garage door business. They initially solicited a long-time employee, but he was not able to finance the purchase. The Debtors then indicated their interest in purchasing the business and the Plaintiffs and the Debtors eventually reached agreement. In the course of their conversations, Mr. Norcross discussed the ownership of the Hopper Farm with one or both of the Debtors on more than one occasion and, in fact, visited the Registry of Deeds and located the First Deed to verify the ownership of the Hopper Farm by Ransford, Jr.

In order to effectuate the sale of the Plaintiffs' business, the parties decided to jointly retain a certain attorney Manuel ("Manuel") to represent their mutual interests in the transaction. Ironically, Manuel was associated with a certain attorney Freedman, who had drawn up both the First Deed and the Second Deed. If Manuel knew anything about the First Deed and the Second Deed, he certainly did not disclose the existence of the Second Deed to the Plaintiffs. This omission proved critical at the closing. On that date, November 20, 1991, the Plaintiffs and the Debtors signed a purchase and sale agreement transferring the business to the Debtors for the sale price of $140,000. The Debtors executed a promissory note, for the full purchase price, payable over approximately 16 years and secured by an interest in the equipment and inventory of the business. At the closing, Mr. Norcross expressed concern that he was to obtain no mortgage on the Hopper Farm as additional collateral. However, Manuel reassured him that because of the great value of the Hopper Farm, no mortgage was necessary. Manuel suggested that such a mortgage would be a "waste of time" as, on any default, the Debtors would not "put themselves insolvent." At no time did Manuel or the Debtors reveal to the Plaintiffs the existence of the Second

---

1. The deed recited consideration of $60,000; however, no consideration actually passed hands.

Deed which was recorded approximately eight (8) months later.

The Defendants made the payments under the promissory note through July 1992 (although the last payment was almost five months overdue), and then made no further payments. Again, the Second Deed was recorded in August, 1992. In August 1994, after foreclosing on the business collateral and realizing a deficiency, the Plaintiffs filed an action against the Debtors and Ransford, Sr. seeking judgment on the promissory note and reconveyance of the Hopper farm from Ransford, Sr. to Ransford, Jr.

In September 1994, the Debtors filed a petition in this Court under Chapter 11 of the Bankruptcy Code. The Chapter 11 case was subsequently, on the Debtors' motion, converted to a case under Chapter 7. The instant complaint was timely filed thereafter.

## II. *Positions of the Parties*

The Plaintiffs argue that the Defendants' statements suggesting that they owned the Hopper Farm were "false and fraudulent." Accordingly, the Plaintiffs contend that the debt owed them by the Debtors is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Furthermore, the Plaintiffs argue that if their claim properly lies under § 523(a)(2)(B), the First Deed constitutes the written statement respecting financial condition required by the provisions of §· 523(a)(2)(B).

Although the Debtors deny making any intentional misstatement, they maintain that, in any event, the alleged misstatements were oral and related to the Defendants' financial condition. Therefore, they argue that the Plaintiffs have no cognizable claim under § 523(a)(2)(A). Moreover, they add that even had the Debtors made a claim under § 523(a)(2)(B), the First Deed is not a writing as to the Debtors' financial condition which would support a claim under § 523(a)(2)(B).

## III. *Discussion*

11 U.S.C. § 523(a)(2) provides that a debtor shall not be discharged from a debt to the extent that it is obtained by:

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable ... reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

■ It is well-established that subsections 523(a)(2)(A) and (a)(2)(B) are mutually exclusive, and that if a "statement respecting the debtor's or an insider's financial condition" is communicated orally, the creditor's claim will fail and the underlying debt will be discharged.[2] However, whether a particular representation is a statement respecting financial condition is a much more complicated matter.

■ Of course, in interpreting the Bankruptcy Code, the Court should first examine the statutory language to determine whether it offers a plain meaning. *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct.

---

**2.** *See* 124 Cong.Rec. H11,095–96 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17,412 (daily ed. Oct. 6, 1978); *Engler v. Van Steinburg (In re Van Steinburg),* 744 F.2d 1060, 1060–61 (4th Cir. 1984); *Blackwell v. Dabney (In re Blackwell),* 702 F.2d 490, 491 (4th Cir.1983); *Zimmerman v. Soderlund (In re Soderlund),* 197 B.R. 742, 744–45 (Bankr.D.Mass.1996) ("[A]n egregiously fraudulent utterance which respects the debtor's financial condition is not a ground for nondischargeability of a debt because it is not in writing."); *GM Card v. Cox (In re Cox),* 182 B.R. 626, 629 (Bankr.D.Mass.1995); *Chemical Bank v. Sigrist (In re Sigrist),* 163 B.R. 940, 947 (Bankr. W.D.N.Y.1994); *Gehlhausen v. Olinger (In re Olinger),* 160 B.R. 1004, 1007 (Bankr.S.D.Ind. 1993); *Connecticut Nat'l Bank v. Panaia (In re Panaia),* 61 B.R. 959, 960–61 (Bankr.D.Mass. 1986) (Goodman, J., sitting by designation).

2051, 2055, 64 L.Ed.2d 766 (1980). However, as noted in *Van Steinburg,* when Congress drafted § 523(a)(2), it "did not speak in terms of financial statements. Instead it referred to a much broader class of statements—those 'respecting the debtor's . . . financial condition.'" 744 F.2d at 1060–61. In other words, the plain language of § 523(a)(2) does not require that the "statement" be a traditional financial statement. And the statute provides no further guidance.

Cases interpreting the term "statement respecting financial condition" have essentially taken shelter in two camps; one could be characterized as the "liberal interpretation" and the other the "narrow interpretation." *See generally Soderlund,* 197 B.R. at 745. The advocates of both the liberal and narrow interpretations appear to agree that a statement as to financial condition need not be a formal financial statement. However, the liberal interpretation would assign to the term any statement which applies to the financial condition of the debtor, while the narrow interpretation would limit the term to statements as to the Debtor's overall financial health. *Id.* The effect of the categorization is profound. Where the interpretation of the term is liberal, the subject misstatement is likely precluded as the basis of nondischargeability under § 523(a)(2)(A), and, absent a writing, has no place under § 523(a)(2)(B). Where the interpretation of the term is narrow, a nondischargeability claim is more likely to be sustained under § 523(a)(2)(A).

At first glance, the relevant cases within this District appear to be split amongst these two camps. *Compare* the liberal interpretations of the term "statement of financial condition" set forth in *Panaia,* 61 B.R. at 960 (holding that an oral misstatement about the debtor's indebtedness to another creditor was a statement respecting the debtor's financial condition) *and Cox,* 182 B.R. at 629 (holding that an implied representation of a debtor's ability to pay a credit card debt was a statement respecting financial condition)

*with* the narrower interpretations of the term as set forth in *Soderlund,* 197 B.R. at 746 (implied representations that debtor would make installment payments required under a promissory note and, if necessary, would obtain additional employment or compensation to fulfill that commitment were not statements respecting financial condition) *and Benjelloun v. Robbins (In re Robbins),* 178 B.R. 299, 304 (Bankr.D.Mass.1995) (statement regarding the value and net worth of a single piece of property was not a statement respecting financial condition).[3]

■ However, the difficulty for this Court is that it agrees with the result in *each* of the foregoing cases. That leaves this Court searching for another approach with which to evaluate the fact patterns of those cases and the one now before it. This Court finds that approach by examining not only the nature of the statement, but the *purpose* for which the statement is sought and made.

An examination of a statement's purpose in order to discover its proper categorization was an approach employed by Judge Ryan of the Bankruptcy Court of the Central District of California in the *Mercado* case. In *Mercado,* the debtor entered into a written agreement to sell the plaintiff his interest in a piece of real estate upon which an apartment complex was being built on the plaintiff's behalf. 144 B.R. at 880. In the course of negotiations, the debtor agreed to supervise the project, and represented to the plaintiff that the project would be completed by a date certain, and that $250,000 would be sufficient to complete the project and clear all liens. *Id.* The debtor failed to properly supervise the project and neither "prediction" came true. When the debtor subsequently filed a Chapter 11 petition, the plaintiff sought to preclude the dischargeability of sums owed. *Id.* at 881.

In holding that the debtor's representations were not statements respecting financial condition, Judge Ryan distinguished *Van Steinburg* and another case applying a liberal

---

**3.** Regarding case law outside this District, *compare Van Steinburg,* 744 F.2d at 1060–61 (liberal interpretation) *and Blackwell,* 702 F.2d at 491 *with Olinger,* 160 B.R. at 1007 (narrow interpre-

tation) *and Jokay Co. v. Mercado (In re Mercado),* 144 B.R. 879, 883–85 (Bankr.C.D.Cal.1992) *and Bal–Ross Grocers, Inc. v. Sansoucy (In re Sansoucy),* 136 B.R. 20, 23 (Bankr.D.N.H.1992).

interpretation to the operative phrase as follows:

> In those [cases], each debtor was attempting to obtain loans and the overall financial condition of each was extremely relevant to the lender in granting the loan. In that circumstance, a misrepresentation regarding a material asset that would effect the evaluation of the overall financial condition of the debtor certainly fits within the parameters of § 523(a)(2)(B). However, that is not the situation here. Plaintiff was interested in the financial condition of the Property. Plaintiff was not relying upon the overall financial condition of Debtor.... The overall financial condition of Debtor was irrelevant to the transaction. Yes, the status of the Property did affect the overall financial condition of Debtor, *but this was neither the focus nor the purpose of the inquiry.* Plaintiff was not relying on Debtor's financial capacity for completion of the Project.... Therefore, I decline to follow the rationale of ... *Van Steinburg.*

144 B.R. at 884 (footnote omitted) (emphasis supplied).

In focusing upon the *purpose* for which the statement was made, Judge Ryan provided a framework for better distinguishing between a statement which implicates a debtor's financial condition from one that does so only incidentally. The results in the above-cited cases from this District are all consistent with the approach of searching out the purpose of the statement complained of. In *Soderlund,* the statements at issue were "implied representations by the debtor, known to be false when made, that she would make the installment payments required under [a promissory] note and, if necessary, would obtain additional employment or compensation to fulfill that commitment." 197 B.R. at 744. The purpose of these statements was not to identify the debtor's current financial condition, but rather to make promises about the debtor's future behavior. In *Robbins,* the nondischargeability complaint arose from a transaction whereby the debtor formed a partnership with the plaintiff to purchase a strip mall from the debtor. 178 B.R. at 300. The court held that even if the debtor's statements as to the value and net worth of the strip mall were untrue, they did not satisfy § 523(a)(2)(B) as they only incidentally implicated the debtor's financial condition. The plaintiff was really interested in the value of the strip mall because he was considering the acquisition of an ownership interest in that property. The purpose of the statement was not to convey the *debtor's* financial condition. *Id.* at 304.

Conversely, in *Panaia,* the purpose of the debtor's misstatement about sums owed to another creditor *was* to convey to the plaintiff a false impression as to the debtor's financial condition, so the court properly determined that § 523(a)(2)(B) was the applicable provision. And in *Cox,* the plaintiff attempted to transform the debtor's use of a credit card into a misrepresentation of its ability to pay, i.e., a "statement" about the debtor's financial condition. That transformed "statement" (even if one were to accept that notion of transformation) could therefore not provide the basis of a viable claim for relief under either § 523(a)(2)(A) (since it concerned the debtor's financial condition) or § 523(a)(2)(B) (because it was not in writing).

In the context of this case, there are two "statements" of the Debtors which the Plaintiffs argue justify a denial of dischargeability under § 523(a)(2): (1) the Defendants' oral statements to the effect that they owned Hopper Farm; and (2) the First Deed, which Mr. Norcross allegedly examined prior to transferring the business to the Defendants. The Court will consider each of these in turn.

The oral statements of the Debtors related to property they owned. However, regardless of whether the Debtors made the statements themselves or as adoptive admissions by silence based on Manuel's statements, the purpose of the statements is clear. The statements were intended to reassure the Plaintiffs that if the business failed, the Debtors currently owned another asset that could satisfy the obligation under the promissory note. Therefore, the oral statements were made by the Debtors and sought by the Plaintiffs not to incidentally describe the ownership of the Hopper farm, but to demonstrate the Debtors' financial condition. No

action can be maintained under § 523(a)(2)(A) on an oral statement respecting a debtor's financial condition. Further, because the statements were not communicated in writing, no action can be maintained thereon under § 523(a)(2)(B).[4]

 The First Deed does not lend itself as the basis for a nondischargeability action under § 523(a)(2)(B) for at least two (2) reasons. First, even if the First Deed could be construed to convey a misrepresentation, that misrepresentation could not have been made with the specific intention of deceiving the Plaintiffs, as required by § 523(a)(2)(B)(iv), because the First Deed was recorded seven (7) years before the sale of the Plaintiffs' business to the Debtors. *See Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 10 (1st Cir. 1994) (holding that § 523(a)(2) did not "intend[ ] simply to deter all bad faith conduct by the debtor irrespective of its effect upon the particular creditor"; claimant must show that "the debtor knowingly or recklessly made a material misrepresentation with intent to deceive the creditor"). Secondly, and more importantly, no claim under § 523(a)(2)(B) was pled. The Complaint in this case only referred to § 523(a)(2)(A), and, in their Joint Trial Memorandum, the parties stipulated that the Plaintiffs' action was brought under § 523(a)(2)(A). Section 523(a)(2)(B) was not raised by the Plaintiffs until trial, when their claim under § 523(a)(2)(A) appeared in jeopardy. At that point, it was too late to discover a new ground for nondischargeability. *See Hecht v. Hatch (In re Hatch)*, 175 B.R. 429, 434–35 (Bankr.D.Mass.1994).

## IV. *Conclusion*

For the foregoing reasons, the Court finds that notwithstanding the truth of the allegations contained in the Plaintiffs' complaint, the alleged misrepresentations by the Debtors in this case do not constitute a basis for not discharging their debt to the Plaintiffs, under either § 523(a)(2)(A) or § 523(a)(2)(B).

A separate judgment of dismissal will issue in conformity herewith.

---

**4.** If the Plaintiff's allegations are true, it could be argued that the result here would fit within the "parade of imaginary horribles" predicted by Judge Hillman in *Soderlund.* However, it must be remembered that the Plaintiffs could have avoided this result by taking a mortgage on the Hopper Farm.